May it please the court, my name is Dean Dickey and I'm here with my colleague Kate Copenheifer and we represent Brian Pringle, a musician and songwriter from San Antonio, Texas. I'd like to reserve three minutes for rebuttal if I may. It's hard to imagine, your honors, a record more replete with material issues of fact in dispute. This is a classic case which, had it gone to trial, would have the trial lawyers arguing to the jury, who do you believe, based on the entire record or small snippets of testimony, or do you look at the overall facts to reach the credibility decisions? But in this case, the district court concluded that summary judgment was appropriate and she did it and found that it was appropriate for three reasons. First, that Mr. Pringle had not deposited a bona fide copy of Take a Dive, the dance version derivative, when he filed his copyright registration with the Copyright Office. Second, she found that the plaintiffs had not proven access for the copyrighted work. And finally, she found, made a finding and a determination, that there was no substantial similarity to Take a Dive, the original version, and I got a feeling. With respect to the district court's finding with respect to a no bona fide copy, the district court was clearly erroneous. I say that because in her opinion, she talks specifically about Exhibit 47 to Mr. Pringle's, to his declaration, which contains a series of instructions as to how to extricate the guitar twang sequence out of the entire music. That portion of Mr. Pringle's declaration was specifically directed to one of the arguments, which had been advanced by the defendants in the motion for summary judgment, in which they contended that it was not possible to do that. Mr. Pringle gave them instructions as to exactly how to do that. And that's what the district court latched on to say, there was no bona fide copy depositive, when in fact, there is detailed testimony and statements in the declaration, which establish how, in fact, Mr. Pringle provided a bona fide copy to the registrar in the Copyright Office. I thought the problem with the bona fide copy was that he applied judgment in determining what the copy would sound like. No, what he did is he reloaded into a piece of equipment called the Ensoniq ASR-10 into presets that when you actually went to those presets would play the song over and over and over every time the same way. He used no reconstruction of that. He simply reloaded what had been saved historically into that device. And what did he mean when he said in doing that he had to use some trial and error? What's the trial and what's the error if it's not the application of judgment? Well, I think it's to make sure that you get the presets into the historic original order, because all of the documents you recall in the evidence that went back to the original creation were stolen. And so it was very much like simply going back to the presets and making sure you had them in the original order. Why would that have required trial and error unless there was no record of what those original presets were? And he's trying to recreate it. No, I don't think that's what he said when he said he was reloading it in the way in which it was loaded originally. And that's what he did, because the device had to have the presets put back into the order that it was originally done. And once it was what record was there of the original order of the presets, was there a record of it? The only record of it as such would have been the original computer, which was not available. So so he was doing it by memory and his memory was like most of us. Not necessarily perfect. So the trial and error was his effort to get back to what he thought it was the first time. I think his testimony and his statement in the declaration was far more positive or specific than trial and error. He knew what he was working with. And he then basically reloaded those preset tunes that had been saved into the order so that it could be played. And then you push the play button so that once you loaded the presets into the A.S.R. 10 and push play, it would play the same every time. I believe that's what he testified to and what he said in the declaration. I think there is some and it was clear, at least from the opinion of the trial court, that there was some confusion by the trial court asked exactly how the A.S.R. 10 work. And in fact, the defendants experts acknowledge that they had no expertise in this device, which went back a number of years and it was such that it could not do lots of things that musical technology permitted as of certainly 2011 and 12. But the way in which the district court characterized and not a bona fide copy, she was just clearly erroneous. With respect to access, the district court said the plaintiff failed to prove access when in fact, the standard in the Ninth Circuit under three boys is did the defendants have a reasonable opportunity to have heard our music? And the evidence on that is quite substantial from the plaintiff's perspective. The plaintiff testified that he personally delivered copies of his music in the clubs in Europe, where one of the defendants, David Guetta, played and was a DJ. The defendant testified that he sent copies of his music to the corporate defendants. He also testified that he couldn't a good quantity of stuff comes through the transom. Is any any evidence of actual receipt? Well, the best evidence of what we have are the other receipts that don't show what was mailed. And the fact is, but the fact of the matter is a reasonable person believing that testimony in light of the big picture. That is all the other evidence could fairly conclude as a question of fact that Mr. Pringle sent those things. Now, we know that access is often direct access, very difficult to prove. Often it's from the substantial evidence and from the entire big picture of what took place here. And what the district court did was make no analysis of that and come to the conclusion that there was no reasonable opportunity to have heard it. She just said we didn't prove it. And under three boys, I think that that was a fair inference to say a reasonable mind could conclude that they had an opportunity to hear it. Moreover, there were non-party witnesses who gave declarations that the music was played during a period of time in Europe where some of the defendants, that particularly those that were supposedly part of the creation were and had access to hearing that music before your time is lost. Let me ask you about something else that quite candidly distresses or concerns me. Do you happen to have a copy of the third brief, your third brief? The reply brief? The reply brief. Turn to page 17, please. It's the beginning of the discussion about the section 1927 sanctions. And just move things along. I'll start reading at the second sentence. Rather, they claim a finding of subjective bad faith does not necessarily award section 1927 sanctions. Appellees are simply wrong. Exclamation point. Section 1927 sanctions must be supported by a finding of subjective bad faith. That's a quote taken from a Federal Appendix Ninth Circuit decision in 2001. So by definition, it's a non-presidential decision. That's responding to a point made in the second brief on page 63 that sets the proposition forward that bad faith need not be found before imposing sanctions for violation of a court order. Citing and accurately quoting from a presidential decision of this court in 2012. And my question is, how is it I'm supposed to be persuaded by your brief, complete with exclamation point, citing to a non-presidential decision in 2001 that doesn't speak to the issue that a presidential decision in 2012 does speak to? I think the way to respond to that question, Your Honor, is that in order to deal with the sanctions issue, it is fair to believe and to argue that subjective bad faith is a condition preceding to a finding for sanctions. You looked at the decision, the presidential decision cited in the second brief from 2012? We have read that decision, yes, Your Honor. And your brief doesn't appear to refer to it. Instead, your brief tries to sell us on the proposition that a non-presidential decision from 11 years earlier should control. Why should I believe anything that you're telling me? I think if you look at the record, Your Honor, the actual testimony and other exhibits, and you look at the big picture, for example, we have alleged that Mr. Pringle created the piece of music in 1999. And there are a whole series of pieces of evidence that go back to that point. We have expert opinions that have said there was substantial similarity. And indeed, with respect to Take a Dive, the dance version, not only do our experts agree with respect to it being an electronic copy, but also, as does one of the defendants, Mr. Geluso. So when you look at the big picture of all of the events, I think that is a fair basis upon which this Court can believe and accept the arguments that are being made. And whether in terms of the precedential decision or the logic in the one that you say is non-precedential, I think the logic in the discussion is something that the Court can take into consideration in determining whether the position asserted makes sense or not. Well, it isn't the question, makes sense or not. You're giving me a statement that appellees are simply wrong, complete with exclamation point. And it's just not true. I got to say, I mean, we get submissions that are disappointing. But I don't expect a brief from a firm of your caliber to contain a statement like that and disregard existing precedent that's already been cited to you in the preceding brief that you're responding to. So that – I will try hard not to let that prejudice the rest of my impression of your case, but I got to say, it doesn't make the brief look particularly credible. I understand that, Your Honor, and I apologize for the exclamation point. Perhaps that should not have been in there, and I concede that. Okay. May I ask you this? The district court said, going back to the access issue, the district court said that the evidence of access is required, and you don't doubt that, for both sampling and the infringement. Now, while – of the original version. Okay. And the district court said, while Pringle's amended complaint touts that he provided his music to and corresponded with a multitude of record labels, when asked for evidence beyond his assertions, Pringle points to postal receipts that purportedly show the plaintiff sent unidentified items by mail to the zip codes identified in the music industry A&R listing. And then when asked for the actual correspondence, you didn't have it, and it, like the hard drive, disappeared. Now what is your response to that? Well, first of all, Mr. Pringle sent and communicated with these organizations and individuals in 1999, 2000, 2001. To focus on whether there were documents going back that far suggests that going back that many years before, he had some grand idea that down the road somebody might copy or take over his music. Is it realistic in the world among people to think that if I'm sending out that copies of my music to different places and I'm a, if you will, a musician and songwriter, but I'm not sophisticated in business, I'm going to create cover letters, save documents, thinking that somewhere down the line I'm going to have a cause of action and a lawsuit requiring documentary evidence to establish it. And the fact is that it is certainly within the realm of reason for someone to testify. This is what I did. This is when I did it. And based upon how I conducted myself 10 years ago, I don't have any documents. I mean, I can't explain it other than that, except that Mr. Pringle is not a sophisticated businessman keeping documents and records. In addition, materials that he did have, it is undisputed, including the original computer and what have you, were in a storage bin that was looted. And there was a police report going back to the early 2000s and identifying those things that were were taken. So I can't. We didn't make up the police report. Okay. Thank you for the argument, and we'll hear from defendants. Are you speaking for all the defendants, or is there an allocation of time? I am, Your Honor. I'm Barry Slotnick of Loeb and Loeb for the defendant appellees and cross appellees. Plaintiff and his attorneys have brought and continue to prosecute an utterly frivolous action for copyright infringement. From the very outset, defendant's expert, Paul Geluso, explained that it was technologically impossible for the defendants to have copied the plaintiff's sound recording. I'm sorry. I might have misheard you. Did you say the plaintiff's expert? The defendant's expert. Okay. Sorry. Paul Geluso's report for the defendants has essentially been unchallenged by the plaintiff's experts. Well, that seems to speak to the sampling claim that, from my review, appears to have dropped out of the case. This has to do with layering and so forth. This has been an educational experience. But what does that say with regard to the claims that are being pushed forward today? Well, first of all, in quoting Your Honor, I guess you get what you need. First of all, there is no withdrawal of the sampling claim. I think hopefully you made it very clear that after, not after only the defendant's expert said it was technologically impossible. Mr. Dickey's own client agreed that it was impossible. So who do you believe? On this one, you can believe the plaintiff. It was technologically impossible. That claim should have dropped out. Counsel's co-counsel said, yeah, we're going to drop it, but it was overruled. So we're here arguing something that is an absurdity. So they're not spending much time talking about that one.  What's left is almost as absurd. Once you take the guitar twang sequence out, you are left with essentially a musical composition copyright case, standard run-of-the-mill kind of case. And once you take that out, defendant's experts have said, A, there are no substantial similarities over any of the protectable elements of the work. None at all. Not the lyrics, not the rhythm, not the harmonics, not the structure, not the melody. Nothing. What you do... Well, we do have this one segment that seems in practical terms identical. Which the Copyright Office refused to register on the grounds that it was not original. How do you register an NRG file? I don't know what they registered. They registered a disc, presumably. And when they registered that disc, it was the second work. This was the dance version as opposed to the original version. The dance version and the original version are virtually identical, except for no lyrics in the dance version and the guitar twang. So what the Copyright Office, in a rare move, did was look at this and say, Okay, you've got this guitar twang, but that doesn't meet the standard of originality sufficient to have a copyright registration. So what you are now left with is everything else but the one thing that may be similar. And it is clear from every expert that nothing there is protectable. What you have instead is two works that are not alike at all. There are some passing similarities of some elements, which are the basic building blocks of music, which not one of Plaintiff's experts has stepped forward and said, You know, if you combine those, there is sufficient originality to create authorship, as in Citaba. So you don't have any of that. What you have is a case that has no similarity on the underlying musical composition and no copying of the guitar twang sequence. So what you have left is nothing. Co-counsel for Plaintiff recognized that, at least with respect to the sampling claim, and wanted to drop it, but didn't. So we've perpetuated all of this. Once you get past that and you get past the bona fides of the deposit copy, which the Court has already recognized, it was from memory. It was based on trial and error. I want to ask you about that. How is it different than if you had an artist in the year 1920 before they had photocopy machines looking at a drawing and making his own copy by looking at it, and he writes a line and goes, No, that's not right. So he erases it, and he makes another line, and he goes, I've got that. Isn't that copyrightable? It is, because that's not from memory. That's from actual sensory perception. You're looking at it, you see it, and you say, I'm going to draw this because this original may be very valuable someday. If I'm an artist, if I'm a graphic artist, I may not want to leave in the Library of Congress the one work that will generate income for me. I'm going to make a sketch drawing copy of that. You know, it is unusual, and it's certainly unusual on the museum. But did the plaintiff have the NRG file that he was listening to as he remixed it? According to him, he had the NRG file, which he had to reconfigure based on trial and error. He didn't have the original work from 1990. I see. Okay. Your Honor, with respect to access, again, I think the Court has sort of recognized that what the plaintiff has argued, essentially, in sort of a movable feast of what access was, to be charitable, it's bare possibility. In the complaint, in the amended complaint, it was, we sent out thousands of copies to all of the executives in the music business, and we got responses from some. None have ever been forthcoming. In the initial disclosure statement, counsel represented that not only did they get responses, but plaintiff had them. We still haven't seen them. What we saw were postal receipts from no one in particular to no one in particular, sending what we don't know. And then finally, you know, you get to this entire, you get past that. They finally realized that the writers of the music were not music executives in the United States or musicians in the United States, but were two Frenchmen, two French disc jockeys, David Guetta and Fred Rister. And now, all of a sudden, nowhere in the pleadings before, you get this new theory. Well, we corresponded with David Guetta's production company in Paris. Really? What proof? No proof. Oh, well, okay. If you don't buy that one, then what we did is we were, I was in Paris once, and I distributed things to clubs in which David Guetta once worked. There's no showing of an overlap of time. There's no showing that he actually received anything. They gave things out, which probably, if you're like any other club, somebody got it and threw it in the trash. Then they go to, well, you know, my brother had a friend who was a disc jockey in Western Europe. Doesn't say where. Doesn't say what radio station. But they do say that, well, yes, it was, he worked at Armed Forces Radio. Because everybody knows that if you are a hip DJ in France, the place you want to go for the latest cutting-edge stuff is Armed Forces Radio. Because that John Philip Sousa cat can really wail. Okay. And then when that doesn't work, they move back to this continent and say, in Toronto, at a community-based college station, Plaintiff's brother played take a dive dance version. Okay. There's no indication that Guetta or Rister or anybody else was ever in Toronto. But that's what they have said. What about the third-party affidavits? The third-party affidavits, one is from Pringle's brother. And that's the one where he said that copies were sent, copies of discs, demos, were given out. But Pringle said in his deposition that he frequently mislabeled those. So he wasn't even sure what was on the disc. And there's no representation by Pringle's brother that anything was on there. And with respect to the other third-party, this was the DJ on Armed Forces Radio, he didn't specifically, it wasn't included within summary judgment, and he didn't specifically say what he played. So if you take an enormous leap of faith, if you are willing to ride on the same snipe hunt that the district court judge accused plaintiff's counselor, and you close one eye and you tilt your head, maybe you can see some, something that doesn't even approach bare possibility of what access can be here. Your Honor, we've gone through all of the extraordinarily unbelievable circumstances that plaintiff is asking the court to buy into before we even get to, well, you know, the really important evidence here might have been some computers, but the plaintiff lost one, destroyed three, two after the lawsuit was brought, two after there was a specific request from defense counsel to retain those, because frankly we find your story a little bit lacking in authenticity. All of those things go into what propelled the district court to say, this case isn't close. This is not a complicated case, frankly. I mean, it may be technologically complicated, but it's legally, this is garden variety copyright infringement. You own something, and by the way, the plaintiff said, yeah, and that guitar playing, you know, I don't remember how I created it, but I might have sampled somebody else's stuff. So you don't have clear ownership. You don't have a registration for anything that has any value. You don't have proof of access. And you have the plaintiff willfully destroying evidence. Kagan. May I ask you about the sanctions? Sure. You've got attorney's fees under the Copyright Act, is that correct? Yes. And you want more. Why is there an abuse of discretion in the district court saying, you know, we're going to give you this, but this is not really bad faith? Well, I think, you know, wanting more would be fine if we actually could collect something from the plaintiff. The plaintiff has made it clear that he is, he has no money, he can't pay. And what we think here is not so much an abuse of discretion issue. We think the Court, we're very happy with the Court's, certainly very happy with the Court's ruling on summary judgment. We're certainly very happy with the analysis that the Court took in dealing with the sanctions issue until the very end. You know, the Court said all of the right things. The Court's ruling was pretty darn helpful to us, that this was brought in bad faith. This case probably should never have been brought. This case was weak at the outset. That counsel was led on a snipe hunt. But she also said that the most lawyers probably would not have accepted representation or would have withdrawn once the facts became clear, which to me seems like the Rule 11 standard. And if most lawyers wouldn't have, isn't that the objective standard, that what the judge said is, well, you know, there needs to be the barest of evidence that you looked into, or, you know, they have to scratch the surface. We are not asking counsel to be the best and the brightest, but we are asking that the standard shouldn't be who's, how much gullibility can you tolerate and at what point. You know, I will acknowledge for this Court that in dealing with the sample issue, there was similarity. If I'm a plaintiff's lawyer, I look at that and say, okay, we have a case. I might be a little concerned about no proof of access, but, okay, they're very similar. I might be concerned about representing in my pleadings that there are documents that I don't have. But once Paul Geluso determined at the preliminary injunction stage, you know, a couple of months into this case, it's technologically impossible. And once plaintiff's own experts refused, you know, I mean, at what point, you know, for years, you know, for years I've been told that my in-laws mean well. At a certain point, you don't really care anymore because that doesn't matter. And I think that that's what this is really all about. At some point, the light has to go on if you are a responsible attorney. Thank you, Your Honor. Thank you. I think I exhausted your time, but I'll still give you a minute for rebuttal. Thank you, Your Honor. Just a couple of points. The district court in the sanctions issue did not abuse her discretion. She lays out the standard, and she carefully evaluated that, and that the lawyers, if you look at the record and find all the things that the lawyers did, relying on experts investigating, getting a forensic expert, the lawyers fulfilled their responsibility, and her conclusion was so. Next, I want to direct the Court's attention to the record, because specifically on pages 780 and 781 of ER, Mr. Slotnick made the comment with respect to the sampling. I just want the Court to recognize that the defendant's expert concluded that the waveforms so closely matched that I believe they are electronic copies of one another, ergo sampling, electronic copies of each other. The sampling claim, if you believe our experts and you believe the creation date, it was a viable claim advanced in good faith. And the derivative work with respect to the findings at the Copyright Office, when they tried to register the derivative, take a dance, the Copyright Office registered it as a sound recording and said it was not sufficiently different from the original to have separate copyright. It's simply a derivative of the original. And therefore, it should have had the same copyright protection. Thank you very much, Your Honor. We thank both counsel for the argument. The case just argued is submitted.
judges: Cogan, Schroeder, Clifton